## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

| | |
|---|---|
| ROBERT MOORE, Individually and for Others Similarly Situated | Case No. 2:25-cv-00038 |
| v. | Jury Trial Demanded |
| BLACKHAWK MINING, LLC | FLSA Collective Action |

### ORIGINAL COLLECTIVE ACTION COMPLAINT

#### SUMMARY

1. Robert Moore (Moore) brings this collective action to recover unpaid wages and other damages from Blackhawk Mining, LLC (Blackhawk).

2. Blackhawk employed Moore as one of its Hourly Employees (defined below) in West Virginia.

3. Moore and the other Hourly Employees regularly work more than 40 hours a workweek.

4. However, Blackhawk does not pay Moore and the other Hourly Employees for all their hours worked, including overtime hours.

5. Rather, Blackhawk requires Moore and the other Hourly Employees to suit out in protective clothing and safety gear necessary to safely perform their job duties and travel into the mines, while on Blackhawk's premises, all prior to being "clocked in."

6. Likewise, Blackhawk requires Moore and the other Hourly Employees to change out of and store their safety gear and protective clothing and wash-up, while on Blackhawk's premises, after being "clocked out." (¶¶ 5-6 together, Blackhawk's "pre/post shift off the clock policy").

7. But Blackhawk does not pay Moore and the other Hourly Employees for the time they spend donning and doffing their safety gear and protective clothing, traveling into the mine, and washing-up, "off the clock," before and after their shifts.

8. Blackhawk's pre/post shift off the clock policy violates the Fair Labor Standards Act (FLSA) by depriving Moore and the other Hourly Employees of overtime wages when they work in excess of 40 hours in a workweek.

9. Additionally, Blackhawk pays Moore and the other Hourly Employees non-discretionary safety, production, and retention bonuses that Blackhawk fails to include in their regular rates of pay for the purpose of calculating their overtime rates of pay (Blackhawk's "bonus pay scheme").

10. Blackhawk's bonus pay scheme violates the FLSA by failing to compensate Moore and the other Hourly Employees at 1.5 times their regular rates of pay—based on all remuneration—for all hours worked in excess of 40 a workweek.

## JURISDICTION & VENUE

11. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this case involves a federal question under the FLSA. 29 U.S.C. § 216(b).

12. This Court has personal jurisdiction over Blackhawk based on its substantial business operations in West Virginia, its substantial contacts with West Virginia, and its substantial conduct directed toward West Virginia, including employing Moore in West Virginia subject to its pre/post shift off the clock policy and bonus pay scheme.

13. Venue is proper because a substantial part of the events or omissions giving rise to the claim occurred in this District and Division. 28 U.S.C. § 1391(b)(2).

14. Specifically, Blackhawk employed Moore subject to its pre/post shift off the clock policy and bonus pay scheme in its Blue Creek and Maple Eagle Complexes located in Kanawha and Fayette County, West Virginia respectively, which are in this District and Division.

## PARTIES

15. Blackhawk employed Moore as a scoop operator from approximately February 2022 through February 2023.

16. Throughout his employment, Blackhawk subjected Moore to its pre/post shift off the clock policy and bonus pay scheme.

17. Moore's written consent is attached as **Exhibit 1**.

18. Moore brings this collective action on behalf of himself and other Blackhawk employees on whom Blackhawk imposed its pre/post shift off the clock policy on and/or paid under its bonus pay scheme.

19. The FLSA Collective of similarly situated employees is defined as:

> **All hourly Blackhawk employees who worked at an operation owned, operated, or controlled by Blackhawk during the last three years (the "Hourly Employees").**

20. Blackhawk is a Delaware limited liability company with its principal place of business in Lexington, Kentucky.

21. Blackhawk may be served with process through its registered agent: **C T Corporation System, 5098 Washington St. W., Ste. 407, Charleston, West Virginia 25313**.

## FLSA COVERAGE

22. At all relevant times, Blackhawk was an "employer" within the meaning of the FLSA. 29 U.S.C. § 203(d).

23. At all relevant times, Blackhawk was an "enterprise" within the meaning of the FLSA. 29 U.S.C. § 203(r).

24. At all relevant times, Blackhawk was an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of the FLSA because it had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials—such as cell phones, tools, and personal protective equipment—that have been moved in or produced for commerce. 29 U.S.C. § 203(s)(1).

25. At all relevant times, Blackhawk had an annual gross volume of sales made or business done of not less than $1,000,000 each year.

26. At all relevant times, Moore and the other Hourly Employees were Blackhawk's "employees" within the meaning of the FLSA. 29 U.S.C. § 203(e).

27. At all relevant times, Moore and the other Hourly Employees were engaged in commerce or in the production of goods for commerce.

**FACTS**

28. "Blackhawk operates eight mining complexes consisting of both surface and underground coal mining methods across Southern West Virginia and Eastern Kentucky [and] primarily mine[s] and sell[s] metallurgical coal."[1]

29. Blackhawk bills itself as "a leading employer in the communities where we are located [with] team members earn[ing] more than twice as much as the average annual income in both Kentucky and West Virginia while receiving industry-leading benefits."[2]

30. To meet its business objectives, Blackhawk employs workers, including Moore and the other Hourly Employees, to mine and process coal.

---

[1] https://blackhawkmining.com/operations/ (last visited January 18, 2025).
[2] https://blackhawkmining.com/employment/ (last visited January 18, 2025).

31. For example, Blackhawk employed Moore as a scoop operator and roof bolter from approximately February 2022 through February 2023 in its Blue Creek and Maple Eagle Mine Complexes in Kanawha and Fayette County, West Virginia, respectively.

32. As a scoop operator, Moore operated a scoop machine underground to transport equipment and supplies as necessary, and as a roof bolter, Moore operated the roof bolting machine to install bolts in the mine walls and roof to stabilize the mine's structure and prevent it from caving in.

33. Moore's job duties in both positions likewise included donning and doffing his safety gear and protective clothing, traveling into the mine, and washing up, on Blackhawk's premises, before and after his scheduled shifts.

34. Throughout his employment, Moore recorded his "on the clock" hours using Blackhawk's designated timekeeping system.

35. Thus, Blackhawk's employment records reflect the number of "on the clock" hours Moore recorded working each week.

36. Throughout his employment, Moore regularly worked more than 40 hours a workweek.

37. Indeed, throughout his employment, Moore typically worked approximately 10 hours a day and 5 days a week (50 hours a workweek) "on the clock."

38. But throughout his employment, Blackhawk did not pay Moore for all his hours worked.

39. Instead, throughout his employment, Blackhawk subjected Moore to its pre/post shift off the clock policy.

40. Specifically, Blackhawk required Moore to dress out in protective clothing and safety gear (including hard hat, head lamp, reflective clothing, ear plugs, steel toed boots, safety glasses,

gloves, self-contained self-rescuer, tracker, proximity box), fundamentally necessary to performing his job and travel into the mine, all "off the clock," and without compensation.

41.   This took Moore approximately 30 minutes to an hour each workday.

42.   Moore could not perform his principal job duties in accordance with Blackhawk's policies, procedures, and expectations without this protective clothing and safety gear and travel into the mine.

43.   Indeed, much of the gear Moore utilized is mandated by federal regulation. *See* 29 C.F.R. § 1910.132; 30 C.F.R. § 56, *et seq*; 30 C.F.R. § 57, *et seq*.

44.   The donning of protective clothing and safety gear are therefore integral and indispensable work duties for Moore.

45.   Likewise, Blackhawk required Moore to travel out of the mine, remove and store his safety gear and protective clothing, and wash up each day at the end of his shift, all "off the clock" and without compensation.

46.   This took Moore approximately 30 minutes to an hour each workday.

47.   Moore could not perform his job duties in accordance with Blackhawk's policies, procedures, and expectations without removing and storing this safety gear and protective clothing and washing up each workday.

48.   Moore could not safely perform his job duties in accordance with Blackhawk's policies, procedures, and expectations without removing and storing this safety gear and protective clothing and washing up each workday.

49.   The removal and storage of safety gear and protective clothing and washing up each day are therefore integral and indispensable work duties for Moore.

50.   But under its pre/post shift off the clock policy, Blackhawk does not compensate him for the same.

51. Thus, because of its pre/post shift off the clock policy, Blackhawk failed to pay Moore overtime wages for all his overtime hours worked during workweeks Moore worked in excess of 40 hours.

52. And when Moore was permitted to "punch in" and "punch out" to record his worktime, Blackhawk would round his "clock in" and "clock out" punches down to the nearest quarter hour consistently resulting in further undercounting of Moore's hours worked.

53. Furthermore, despite its agreement to do so, Blackhawk never provided or made available work free, uninterrupted meal breaks to Moore.

54. Blackhawk likewise never provided or made available work free, uninterrupted rest breaks to Moore.

55. Rather, Moore spent his entire workday working on behalf of Blackhawk for its primary benefit.

56. Moore and the other Hourly Employees perform their jobs under Blackhawk's supervision and use materials, equipment, and technology Blackhawk approves and supplies.

57. Blackhawk requires Moore and the other Hourly Employees to follow and abide by common work, time, pay, and overtime policies and procedures in the performance of their jobs.

58. Moore's and the other Hourly Employees' work must strictly adhere to the uniform standards put in place by Blackhawk.

59. At the end of each pay period, Moore and the other Hourly Employees receive wages from Blackhawk that are determined by common systems and methods that Blackhawk selects and controls.

60. Likewise, the other Hourly Employees typically record working approximately 10 hours a day and 5 days a week (50 hours a workweek) "on the clock."

61. But, just as with Moore, Blackhawk fails to pay them for all their hours worked.

62. Indeed, Blackhawk uniformly subjects the other Hourly Employees to the same or similar pre/post shift off the clock policy it imposed on Moore.

63. Specifically, just as with Moore, Blackhawk requires them to dress out in their protective clothing and safety gear (including hard hat, head lamp, reflective clothing, ear plugs, steel toed boots, safety glasses, gloves, self-contained self-rescuer, tracker, proximity box), fundamentally necessary to performing their jobs and travel into the mine, all "off the clock," and without compensation.

64. And Blackhawk requires them to exit the mine and remove and store their safety gear and protective clothing and wash up after their shifts, likewise, "off the clock" and without compensation.

65. And like Moore, much of the gear they must utilize is mandated by federal regulation. *See* 29 C.F.R. § 1910.132; 30 C.F.R. § 56, *et seq*; 30 C.F.R. § 57, *et seq*.

66. But, like Moore, the other Hourly Employees are regularly forced to perform this compensable work "off the clock" before and/or after their shifts.

67. Thus, just as with Moore, Blackhawk does not pay the other Hourly Employees for this integral and indispensable work they are required to perform "off the clock" before and after their scheduled shifts.

68. And, just as with Moore, these job duties take the other Hourly Employees approximately an hour to 2 hours to complete each workday.

69. And just as with Moore, when the other Hourly Employees were permitted to "punch in" and "punch out" to record their worktime, Blackhawk rounded their "clock in" and "clock out" punches down to the nearest quarter hour consistently resulting in further undercounting of their hours worked.

70. And, despite its agreement to do so, Blackhawk never provided or made available work free, uninterrupted meal breaks to the other Hourly Employees.

71. Blackhawk likewise never provided or made available to work free, uninterrupted rest breaks to the other Hourly Employees.

72. Rather, like Moore, the other Hourly Employees spend their entire workdays working on behalf of Blackhawk for its primary benefit.

73. Blackhawk fails to exercise its duty as the Hourly Employees' employer to ensure they are not performing work "off the clock" on its premises that Blackhawk does not want performed.

74. And Blackhawk knows, should know, or recklessly disregards whether Moore and the other Hourly Employees routinely perform integral and indispensable work "off the clock," and without compensation, before and after their scheduled shifts for Blackhawk's primary benefit.

75. Thus, Blackhawk requests, suffers, permits, or allows Moore and the other Hourly Employees to work "off the clock," without compensation, before and after their scheduled shifts.

76. Despite accepting the benefits, Blackhawk does not pay Moore and the other Hourly Employees for the compensable work they perform "off the clock."

77. Thus, under Blackhawk's uniform pre/post shift off the clock policy, Moore and the other Hourly Employees are denied overtime wages for the compensable work they perform "off the clock" before and after their scheduled shifts during workweeks in which they work more than 40 hours.

78. And throughout their employment, Blackhawk has not paid Moore and the other Hourly Employees at the required premium rate for all hours worked in excess of 40 in a workweek.

79. Instead, Blackhawk pays Moore and the other Hourly Employees under its bonus pay scheme.

80. Specifically, Blackhawk pays Moore and the other Hourly Employees non-discretionary safety, production, and retention bonuses that it fails to include in these employees' regular rates of pay for overtime purposes.

81. Thus, under Blackhawk's bonus pay scheme, it does not pay Moore and the other Hourly Employees overtime wages at the required rate—based on all remuneration—for all hours they work in excess of 40 a workweek.

82. The Hourly Employees are thus uniformly subject to the same or similar unlawful policies—Blackhawk's pre/post shift off the clock policy and bonus pay scheme—for similar work, in willful violation of the FLSA.

## COLLECTIVE ACTION ALLEGATIONS

83. Moore brings his claims as a collective action under Section 216(b) of the FLSA on behalf of himself and the other Hourly Employees.

84. Like Moore, the other Hourly Employees are victimized by Blackhawk's pre/post shift off the clock policy and bonus pay scheme.

85. Other Hourly Employees worked with Moore and indicated they were paid in the same manner, performed similar work, and were subject to Blackhawk's same pre/post shift off the clock policy and bonus pay scheme.

86. Based on his experience with Blackhawk, Moore is aware Blackhawk's pre/post shift off the clock policy and bonus pay scheme were imposed on other Hourly Employees.

87. The Hourly Employees are similarly situated in the most relevant respects.

88. Even if their precise job duties and locations might vary, these differences do not matter for the purposes of determining their entitlement to overtime wages at the required premium rate for all overtime hours worked.

89. Therefore, the specific job titles or job locations of the Hourly Employees do not prevent collective treatment.

90. Rather, Blackhawk's pre/post shift off the clock policy and bonus pay scheme render Moore and the other Hourly Employees similarly situated for the purpose of determining their right to overtime wages at the required rate for all overtime hours worked.

91. Blackhawk's records reflect the number of "on the clock" hours the Hourly Employees were recorded as working each week.

92. Blackhawk's records also show Blackhawk paid the Hourly Employees non-discretionary bonuses it failed to include in their regular rates of pay.

93. The back wages owed to Moore and the other Hourly Employees can therefore be calculated using the same formula applied to the same records.

94. Even if the issue of damages were somewhat individual in character, the damages can be calculated by reference to Blackhawk's records, and there is no detraction from the common nucleus of liability facts.

95. Therefore, the issue of damages does not preclude collective treatment.

96. Moore's experiences are therefore typical of the experiences of the other Hourly Employees.

97. Moore has no interest contrary to, or in conflict with, the other Hourly Employees that would prevent collective treatment.

98. Like each Hourly Employee, Moore has an interest in obtaining the unpaid wages owed under federal law.

99. Moore and his counsel will fairly and adequately protect the interests of the Hourly Employees.

100. Moore retained counsel with significant experience in handling complex collective action litigation.

101. Absent this collective action, many Hourly Employees will not obtain redress for their injuries, and Blackhawk will reap the unjust benefits of violating the FLSA.

102. Further, even if some of the Hourly Employees could afford individual litigation, it would be unduly burdensome to the judicial system.

103. Indeed, the multiplicity of actions would create a hardship to the Hourly Employees, the Court, and Blackhawk.

104. Conversely, concentrating the litigation in one forum will promote judicial economy and consistency, as well as parity among the Hourly Employees' claims.

105. The questions of law and fact that are common to each Hourly Employee predominate over any questions affecting solely the individual members.

106. Among the common questions of law and fact are:

    a. Whether Blackhawk imposed its pre/post shift off the clock policy on the Hourly Employees;

    b. Whether Blackhawk's pre/post shift off the clock policy deprived the Hourly Employees of overtime compensation for overtime hours worked;

    c. Whether Blackhawk paid the Hourly Employees non-discretionary bonuses;

    d. Whether Blackhawk engaged in a policy or practice of failing to include non-discretionary bonuses in the Hourly Employees' regular rates of pay for the purpose of calculating overtime;

  e. Whether Blackhawk failed to pay the Hourly Employees overtime wages at the required premium rates—based on all remuneration—for all overtime hours worked;

  f. Whether Blackhawk's decision not to pay the Hourly Employees overtime wages at the required rates—based on all remuneration—for all overtime hours worked was made in good faith; and

  g. Whether Blackhawk's violations were willful?

107. Moore knows of no difficulty that will be encountered in the management of this litigation that would preclude its ability to go forward as a collective action.

108. As part of its regular business practices, Blackhawk intentionally, willfully, and repeatedly violated the FLSA with respect to Moore and the other Hourly Employees.

109. Blackhawk's pre/post shift off the clock policy and bonus pay scheme deprived Moore and the other Hourly Employees of the overtime wages at the required premium rate—based on all remuneration—for overtime hours worked, in willful violation of the FLSA.

110. There are many similarly situated Hourly Employees who have been denied overtime pay at the required rate—based on all remuneration—for all overtime hours worked, in violation of the FLSA, who would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join it.

111. The Hourly Employees are known to Blackhawk, are readily identifiable, and can be located through Blackhawk's business and personnel records.

### BLACKHAWK'S VIOLATIONS WERE WILLFUL

112. Blackhawk knew it employed the Hourly Employees.

113. Blackhawk knew it was subject to the FLSA's overtime provisions.

114. Blackhawk knew Moore and the other Hourly Employees were its non-exempt employees entitled to overtime pay.

115. Blackhawk knew the FLSA required it to pay non-exempt employees, including Moore and the other Hourly Employees, overtime wages at rates not less than 1.5 times their regular rates of pay—based on all remuneration—for all hours worked after 40 a workweek.

116. Blackhawk knew Moore and each Hourly Employee worked more than 40 hours in at least one workweek during the last 3 years because Blackhawk recorded their "on the clock" hours via its timekeeping system.

117. Blackhawk knew it paid the Hourly Employees according to its pre/post shift off the clock policy.

118. Blackhawk knew it had a duty to ensure the Hourly Employees were not performing work "off the clock" (without pay).

119. Blackhawk knew it required the Hourly Employees to don and doff safety gear and protective clothing, then travel into the mine, and wash-up, "off the clock."

120. Blackhawk knew it controlled the Hourly Employees' work procedures.

121. Blackhawk knew the Hourly Employees' mandatory "off the clock" work was a fundamental requirement of their jobs with Blackhawk.

122. Blackhawk knew the Hourly Employees' mandatory "off the clock" work was an integral and indispensable requirement to their principal job duties with Blackhawk.

123. Blackhawk knew the Hourly Employees routinely performed this daily, required "off the clock" work for Blackhawk's predominant benefit.

124. In other words, Blackhawk knew the Hourly Employees performed compensable work (*e.g.*, donning/doffing their safety gear and protective clothing, then traveling into the mines, and washing-up) "off the clock" and without compensation.

125. Blackhawk knew it paid Moore and the other Hourly Employees non-discretionary safety, production, and retention bonuses.

126. Blackhawk knew these non-discretionary bonuses were not included in Moore's and the other Hourly Employees' regular rates of pay for the purpose of calculating their overtime rates of pay.

127. And Blackhawk knew the FLSA required it to pay Moore and the other Hourly Employees at least 1.5 times their regular rates of pay—based on all remuneration—for all hours worked in excess of 40 a workweek.

128. Blackhawk knew Moore and the other Hourly Employees regularly worked in excess of 40 hours a workweek.

129. Thus, Blackhawk knew, should have known, or recklessly disregarded whether it failed to pay Moore and the other Hourly Employees at least 1.5 times their regular rates of pay—based on all remuneration—for all the hours they worked in excess of 40 a workweek.

130. Blackhawk's failure to pay Moore and the other Hourly Employees overtime at the required rates—based on all remuneration—for all overtime hours worked was neither reasonable, nor was this shared decision made in good faith.

131. Blackhawk knowingly, willfully, and/or in reckless disregard of the FLSA carried out its unlawful bonus pay scheme and pre/post shift off the clock policy that deprived Moore and the other Hourly Employees of overtime wages at the required rate of pay—based on all remuneration—for all hours worked after 40 a workweek, in violation of the FLSA.

## CAUSE OF ACTION

### FAILURE TO PAY OVERTIME UNDER THE FLSA
### (FLSA COLLECTIVE)

132. Moore brings his FLSA claim as a collective action on behalf of himself and the other Hourly Employees pursuant to 29 U.S.C. § 216(b).

133. Blackhawk violated, and is violating, the FLSA by employing non-exempt employees, such as Moore and the other Hourly Employees, in a covered enterprise for workweeks longer than 40 hours without paying such employees overtime wages at rates not less than 1.5 times their regular rates of pay—based on all remuneration—for the hours they worked in excess of 40 a workweek.

134. Blackhawk's unlawful conduct harmed Moore and the other Hourly Employees by depriving them of the overtime wages they are owed.

135. Accordingly, Blackhawk owes Moore and the other Hourly Employees the difference between the wages actually paid and the overtime wages actually earned.

136. Because Blackhawk knew, or showed reckless disregard for whether its bonus pay scheme and pre/post shift off the clock policy violated the FLSA, Blackhawk owes Moore and the other Hourly Employees these wages for at least the past 3 years.

137. Blackhawk is also liable to Moore and the other Hourly Employees for an amount equal to all their unpaid overtime wages as liquidated damages.

138. Finally, Moore and the other Hourly Employees are entitled to recover all reasonable attorneys' fees and costs incurred in this action.

## JURY DEMAND

139. Moore demands a trial by jury on all Counts.

## RELIEF SOUGHT

WHEREFORE, Moore, individually and on behalf of the other Hourly Employees, seeks the following relief:

    a. An Order designating this lawsuit as a collective action and authorizing notice to the Hourly Employees allowing them to join this action by filing a written notice of consent;

b. An Order finding Blackhawk liable to Moore and the other Hourly Employees for unpaid overtime wages owed under the FLSA, plus liquidated damages in an amount equal to their unpaid wages;

c. Judgment awarding Moore and the other Hourly Employees all unpaid wages, liquidated damages, statutory damages, and any and other penalties available under the FLSA;

d. An Order awarding attorneys' fees, costs, and expenses;

e. An Order awarding pre- and post-judgement interest at the highest applicable rates; and

f. Such other and further relief as may be necessary and appropriate.

Date: January 22, 2025

Respectfully submitted,

**POWELL & MAJESTRO P.L.L.C.**

/s/ *Anthony J. Majestro*
Anthony J. Majestro (WVSB 5165)
Graham B. Platz (WVSB 14093)
405 Capitol Street, Suite 807
Charleston, West Virginia 25301
Phone: (304) 346-2889
Fax:    (304) 346-2895
amajestro@powellmajestro.com
gplatz@powellmajestro.com

Michael A. Josephson*
Andrew W. Dunlap*
**JOSEPHSON DUNLAP LLC**
11 Greenway Plaza, Suite 3050
Houston, Texas 77046
Phone: (713) 352-1100
Fax:    (713) 352-3300
mjosephson@mybackwages.com
adunlap@mybackwages.com

- 18 -

Richard J. (Rex) Burch*
**BRUCKNER BURCH PLLC**
11 Greenway Plaza, Suite 3025
Houston, Texas 77046
Phone: (713) 877-8788
Fax:     (713) 877-8065
rburch@brucknerburch.com

*Pro hac vice applications forthcoming*

**ATTORNEYS FOR MOORE &
THE HOURLY EMPLOYEES**